# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **DWAINE GOVAN,** *et al.*, | |
| **Plaintiffs,** | **CIVIL ACTION NO.** |
| **v.** | **5:16-cv-00503-TES** |
| **CITY OF MCINTYRE,** *et al.*, | |
| **Defendants.** | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### FACTUAL BACKGROUND

The following material facts are undisputed.[1] Plaintiff Anthony Richardson, Sr. owns Superior Services and Installation, delivering home and office furnishings to online customers of SEKO Worldwide.[2] On February 26, 2015, Plaintiffs Dwaine Govan and Anthony Richardson, Jr.,[3] two Superior Services employees, made a delivery in Milledgeville, Georgia, and then headed to Eastman, Georgia, to make a second delivery

---

[1] In Deputy McDade's Response to Plaintiffs' Statement of Additional Facts [Doc. 49], he repeatedly objects to certain facts because he claims they are "not material to the issues pending before the Court." Doc. 49, ¶¶ 4, 5, 9, 10, 12—16, 18—20, 26—32, 34, 35, 37, 38, 42—46, 56, 59, 62, 72—79, 82, 84—96, 98, 103—107, 109. To the extent Deputy McDade does not dispute the facts contained in these paragraphs, they are deemed admitted. LR 56, MDGa.

[2] Doc. 29-1, ¶ 1; Doc. 35-2, ¶ 4.

[3] For the sake of clarity, the Court will hereinafter refer to Richardson, Jr. as simply "Richardson" and Richardson, Sr. as "Richardson, Sr."

in a white van owned by Richardson, Sr.[4] Richardson drove while Govan rode in the passenger seat.[5]

At approximately 2:45 p.m., Officer Zimbalist Steele of the City of McIntyre Police Department ("Officer Steele") pulled the van over for speeding at more than 75 miles per hour in a 45-mile-per-hour zone.[6] Officer Steele testified that after he activated his patrol lights, Richardson continued driving for half-a-mile to one mile before he pulled over.[7] However, Richardson testified that "[Officer Steele] turned his lights on, so then that is when I pulled over."[8] Prior to exiting his patrol car, Officer Steele called the police dispatcher and requested backup, but did not explain why he needed backup.[9] Without waiting for backup to arrive, Officer Steele approached the driver's side window and asked Richardson for his driver's license and the van's registration.[10] Richardson provided his driver's license, but he and Govan could not find the vehicle's registration

---

[4] Doc. 29-1, ¶¶ 2, 4.

[5] Doc. 27-2, ¶ 2.

[6] Doc. 29-1, ¶ 5.

[7] Doc. 37, p. 57:4-17.

[8] Doc. 44, p. 35:10-18.

[9] Doc. 35-2, ¶¶ 20-21.

[10] Doc. 27-2, ¶ 4; Doc. 35, ¶ 22. There is uncertainty as to whether Officer Steele asked Richardson for the vehicle's registration or proof of insurance or both. Officer Steele testified that he asked for proof of insurance, whereas Richardson testified that Officer Steele requested the vehicle's registration. Nevertheless, this does not present a genuine issue of material fact. *Compare* Doc. 36, pp. 60:21—61:2 *with* Doc. 44, p. 37:10-18.

and/or proof of insurance.[11] Richardson then explained to Officer Steele that he did not own the van.[12]

Officer Steele testified that both Richardson and Govan were "shaking" from nervousness during the traffic stop and appeared more nervous than the average person, but Richardson and Govan averred that they showed no outward signs of nervousness during the stop.[13] Officer Steele also witnessed Govan using his cell phone during the stop.[14] Govan testified that he was using the phone to read and respond to emails.[15]

In the meantime, Wilkinson County Sheriff's Deputy and K-9 Handler Kyle McDade ("Deputy McDade") heard Officer Steele's request for backup and arrived at the scene of the traffic stop with a drug-trained canine approximately ten minutes after the stop began.[16] Officer Steele did not specifically request a K-9 unit.[17] Officer Steele issued Richardson a traffic citation for speeding and gave Richardson his driver's license.[18] Officer Steele then began to ask Richardson and Govan questions unrelated to the traffic

---

[11] Doc. 27-2, ¶ 5; Doc. 29-1, ¶ 11; *see supra*, note 10.

[12] Doc. 29-1, ¶ 12.

[13] Doc. 37, pp. 62:18—63:11; Doc. 34-15, ¶ 4; Doc. 34-16, ¶ 4.

[14] Doc. 29-1, ¶ 8.

[15] Doc. 46, p. 32:1-12.

[16] Doc. 27-2, ¶ 9; Doc. 35-2, ¶ 23.

[17] Doc. 29-1, ¶ 14.

[18] Doc. 35-2, ¶ 25.

stop and threateningly told Govan to put down his cell phone.[19] Office Steele inquired about the contents of the van and questioned both occupants about where they had been and where they were going.[20] Richardson and Govan told Officer Steele that there was nothing in the van and that they were making furniture deliveries that day.[21] They also told Officer Steele that the back of the van contained a vanity in a single large box.[22] Either Richardson or Govan told Officer Steele that they had just left from an "insurance place" in Milledgeville, while the other told Officer Steele they had come from a "tax place."[23] Officer Steele then told Richardson to step out of the van so that he could search him due to his nervousness.[24] Officer Steele made Richardson take off his sweatshirt and confiscated his keys, cell phone, and wallet, and told Richardson to stand behind the van in the area in front of his patrol car.[25]

While Richardson waited, Officer Steele conferred with Deputy McDade, and they decided to take the K-9 around the van to sniff for drugs in order to "eliminate one thing"

---

[19] *Id.* at ¶¶ 26, 27.

[20] *Id.* at ¶ 28.

[21] *Id.* at ¶ 29.

[22] Doc. 29-1, ¶ 18.

[23] *Id.* at ¶ 16.

[24] Doc. 35-2, ¶ 30.

[25] *Id.* at ¶¶ 31, 32.

and to "get it out of the way if there's anything else [in the van]," which Deputy McDade

believed to be a good idea.[26] The officers then asked Govan to exit the vehicle, and Deputy

McDade walked the drug dog around the van twice.[27] Both Richardson and Deputy

McDade testified that the dog alerted on the van's gas cap (although Richardson testified

that the dog alerted by tapping the gas cap and McDade testified that the dog sat down

by the gas cap).[28] Govan stated that he had "a clear view" of the drug dog and did not see

it alert to anything; however, he also testified that the drug dog was merely in his

"peripheral."[29]

After the drug dog alerted, Officer Steele called his supervisor, City of McIntyre

Chief of Police Donald Amerson ("Chief Amerson").[30] Chief Amerson, who was nearby,

arrived at the scene approximately 15 minutes after Officer Steele made the initial stop.[31]

When Chief Amerson arrived, at least five other officers from the Wilkinson County

Sheriff's Department were on the scene, and both Richardson and Govan were already

handcuffed and sitting in separate patrol cars.[32] Officer Steele told Chief Amerson what

---

[26] Doc. 37, pp. 67:23—68:6; Doc. 38, p. 54:6-15.

[27] Doc. 29-1, ¶ 20; Doc. 35-2, ¶ 50.

[28] Doc. 38, p. 53:16-18; Doc. 44, pp. 39:24—40:9.

[29] Doc. 46, p. 43:13-18.

[30] Doc. 35-2, ¶ 56.

[31] *Id.* at ¶ 57; Doc. 29-1, ¶ 17.

[32] Doc. 35-2, ¶¶ 69, 70.

he witnessed prior to and during the stop, including Richardson speeding, Richardson's nervousness, the drug dog alert, and Richardson and Govan's inconsistent stories about their previous location.[33]

Chief Amerson, Officer Steele, and the other officers on the scene believed they had sufficient probable cause to search the van.[34] Deputy McDade then took the drug dog into the back of the van, where the dog "showed interest" in the box containing a vanity.[35] Due to safety concerns, the officers decided to tow the van to a Wilkinson County Sheriff's facility to conduct a more in-depth search and decided to get a search warrant in order to do so.[36] Officer Steele testified that all of the officers on the scene decided to take Richardson and Govan to the Wilkinson County jail while they conducted the in-depth search of the van.[37] Chief Amerson understood that Richardson and Govan would be held in the jail at the Wilkinson County Sheriff's Office and did not suggest to Richardson or Govan that they could be taken to another location.[38]

---

[33] *Id.* at ¶¶ 71—74.

[34] Doc. 29-1, ¶ 23.

[35] Doc. 35-2, ¶ 64; Doc. 27-2, ¶ 14; Doc. 38, p. 25:4-17.

[36] Doc. 29-1, ¶ 24; Doc. 42, p. 30:10-21.

[37] Doc. 37, p. 86:2-9.

[38] Doc. 35-2, ¶ 82; Doc. 39, p. 23:4-6.

At approximately 4:00 p.m., Officer Steele and another officer took Richardson and Govan in separate patrol cars to the Wilkinson County jail.[39] Deputy McDade did not transport either Richardson or Govan to the Sheriff's Office, and was not aware that they were taken to the jail.[40] Richardson and Govan were taken to the sallyport of the jail, which is not open to the public and is where other arrestees are taken.[41] No one allowed Richardson and Govan to leave the jail, and they did not have their personal effects with them when they arrived at the jail.[42] Deputies placed them in separate holding cells, strip searched them, and denied them the chance to make any phone calls.[43] The deputies fingerprinted Richardson and took his photograph, i.e., his "mug shot."[44]

After Richardson and Govan arrived at the jail, Officer Steele completed a search warrant application in order to conduct a more thorough search of the van and the box containing a vanity in the back of the van, which stated as follows:

> On 2/26/2015 at approximately 14:47 hours affiant conducted a traffic stop on the above described vehicle for a speeding violation on Hwy 411 south bound in the city limits of McIntyre, GA. Affiant approached the driver and advised him of the reason for the stop. Affiant noticed that the driver was acting in a more nervous manner than most violators act on affiant's routine

---

[39] Doc. 35-2, ¶ 84.

[40] Doc. 27-2, ¶ 18; Doc. 38, p. 35:2-9.

[41] Doc. 35-2, ¶¶ 85, 86.

[42] *Id.* at ¶¶ 88, 89.

[43] *Id.* at ¶ 90.

[44] Doc. 27-2, ¶ 27.

encounters. The passenger was on cell phones [sic] during the stop. Driver stated that he could not find his insurance card for the van and that the van belonged to his father. He was only able to produce a shipping receipt to Melissa Sikes of Cochran, GA. During the process of the stop while affiant was writing the speeding ticket Deputy Kyle McDade arrived with a drug K-9 and conducted a perimeter scan of the vehicle. The result was a positive alert on the gas cap area, the passenger door and K-9 showed interest on the box inside the vehicle. The passenger and the driver were asked out of the vehicle and placed into separate patrol cars. McDade asked the driver who the passenger was and the driver stated that he only knows the passenger's first name but did not know the passenger's last name. McDade asked where they had been and the driver stated that they made a delivery in Milledgeville to an insurance place. McDade asked the passenger where they had been and he stated that they just made a delivery to a tax place in Milledgeville.[45]

A Wilkinson County magistrate judge granted the search warrant application, and the officers (including Deputy McDade) conducted a thorough search of the van with the assistance of the drug dog.[46] The officers found no drugs, contraband, or other evidence of criminal activity during the search.[47]

After Richardson and Govan were held for three to five hours, deputies finally released them from the Wilkinson County jail and took them to the van where the search had been conducted.[48] Aside from Richardson's speeding citation, neither Officer Steele nor any other law enforcement officer charged Richardson or Govan with any crime as a

---

[45] Doc. 35-2, ¶ 94; Doc. 34-11, p. 1.

[46] Doc. 29-1, ¶ 27.

[47] Doc. 35-2, ¶ 102.

[48] *Id.* at ¶ 103; Doc. 27-2, ¶ 28.

result of these events.[49] Due to the length of their detention, Richardson and Govan did not complete the delivery of vanity in the back of the van, their last delivery of the day.[50] Richardson, Sr. claims that, as a result of these events, he lost his contract with SEKO Worldwide, his sole client, and suffered personal financial loss.[51]

Plaintiffs filed suit against Officer Steele, Deputy McDade, and the City of McIntyre ("the City"), asserting Fourth Amendment claims pursuant to 42 U.S.C. § 1983 for unlawful detention, false arrest, and unlawful search and seizure. Richardson and Govan also brought claims against Officer Steele and the City for unlawful detention, assault, and battery under Georgia law. Officer Steele moves for summary judgment and asserts qualified immunity on all of Plaintiffs' Section 1983 claims and official immunity on all of Plaintiffs' state-law claims. Deputy McDade moves for summary judgment and also asserts qualified immunity on Plaintiffs' Section 1983 claims. Finally, the City moves for summary judgment on all claims against it and asserts sovereign immunity on Plaintiffs' state-law claims.

For the reasons that follow, Officer Steele's motion is granted in part and denied in part, Deputy McDade's motion is granted, and the City's motion is granted in part and denied in part.

---

[49] Doc. 35-2, ¶ 104.

[50] *Id.* at ¶ 106.

[51] *Id.* at ¶ 109.

## DISCUSSION

### A.   <u>Standard of Review</u>

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[52] As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case."[53] As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving party's case or (2) provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."[54]

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present affirmative evidence to show that a genuine

---

[52] Fed. R. Civ. P. 56(c).

[53] *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)).

[54] *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

issue of material fact exists."[55] "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[56]

The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant.[57] However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible."[58]

**B.     <u>Count I: Illegal Detention</u>**

In their first cause of action, Govan and Richardson have sued Officer Steele for allegedly prolonging the traffic stop without justification in violation of the Fourth Amendment. Officer Steele contends that he is entitled to qualified immunity on this claim.

Qualified immunity protects public officers acting within the scope of their discretionary authority as long as they do not violate clearly established law.[59] The burden of proof for a qualified immunity defense initially rests with the officer, who must show that he was "acting within the scope of his discretionary authority when the alleged

---

[55] *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

[56] *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)).

[57] *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006).

[58] *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (internal quotations omitted).

[59] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

wrongful acts occurred."[60] In this case, neither Plaintiff disputes that Officer Steele acted

within his discretionary authority during the traffic stop. Therefore, the burden shifts to

Plaintiffs to show that immunity does not apply.[61] Plaintiffs satisfy this burden if the facts,

taken in the light most favorable to them, show that Officer Steele's conduct violated a

clearly established constitutional right.[62]

### 1. Whether Officer Steele violated Plaintiffs' constitutional rights by prolonging the traffic stop.

Because Defendants established that Officer Steele acted within his discretionary

authority, Plaintiffs must now establish that the facts, taken in the light most favorable to

them, show that Officer Steele violated a constitutional right.[63] Plaintiffs argue that

Officer Steele did so by prolonging the stop without reasonable suspicion of illegal

activity.

A traffic stop constitutes a seizure under the Fourth Amendment; however,

because a traffic stop is to be of a limited nature, it is "more analogous to an investigative

detention than custodial arrest" and is analyzed under *Terry v. Ohio*.[64] Thus, to comply

with the Fourth Amendment, a traffic stop "must be reasonably related in *scope* to the

---

[60] *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

[61] *Id.*

[62] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[63] *Id.*

[64] *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001).

circumstances which justified the interference in the first place."[65] Moreover, the traffic stop may not extend in *duration* beyond the time necessary to process the traffic violation without reasonable, articulable suspicion of other illegal activity.[66] That is, a traffic stop can last as long in duration as is necessary to achieve tasks within the scope or "mission" of the stop, which typically include "determining whether to issue a traffic ticket . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[67] To extend the stop beyond that duration, an officer must have reasonable, articulable suspicion of other illegal activity.[68]

To determine whether Officer Steele violated Richardson and Govan's Fourth Amendment rights, the Court must assess whether Officer Steele prolonged the stop. If so, the Court must also determine whether he had the requisite reasonable suspicion to do so.

### a. Whether Officer Steele prolonged the traffic stop.

When an officer conducts a traffic stop, which is a limited investigative detention subject to the parameters of *Terry*, his actions must be "reasonably related in *scope* to the

---

[65] *Id.* (quoting *Terry*, 392 U.S. at 20) (emphasis in original).

[66] *Id.* (citing *United States v. Holloway*, 113 F.3d 192, 196 (11th Cir. 1997)).

[67] *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015).

[68] *Purcell*, 236 F.3d at 1277.

circumstances which justified the interference in the first place," and "the *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop."[69] As a preliminary matter, Plaintiffs do not argue that the duration of the traffic stop was *per se* unreasonable.[70] The Court agrees; it was not.

Plaintiff does argue that, regardless of the overall duration of the traffic stop, it should have ended when Officer Steele issued a traffic citation unless he had reasonable and articulable suspicion of other illegal activity. The facts clearly and unequivocally establish that although Deputy McDade arrived on the scene of the traffic stop with the drug dog while Officer Steele was in the process of writing Richardson a traffic citation,[71] Officer Steele had already handed Richardson the citation prior to Deputy McDade walking the dog around the van's exterior.[72] Thus, at the time Officer Steele "issued" the warning citation to Richardson, the traffic stop was over, and Officer Steele was not permitted to detain Richardson and Govan past that point without reasonable and

---

[69] *Id.* (emphasis in original).

[70] *See United States v. Perkins*, 348 F.3d 965, 969-70 (11th Cir. 2003) (affirming magistrate judge's finding that twelve-minute traffic stop was not unreasonable); *Purcell*, 236 F.3d at 1277 ("A detention of fourteen minutes is certainly not unreasonable on its face.").

[71] Doc. 37, p. 66:8-16; Doc. 38, p. 51:8-12.

[72] Doc. 37, p. 71:19-24.

articulable suspicion of some illegal activity.[73] Officer Steele clearly prolonged the traffic stop.

> **b.** **Whether Officer Steele lacked arguable reasonable suspicion to prolong the stop.**

Having determined that Officer Steele prolonged the traffic stop, the Court must now determine whether he had justification to do so. An officer must have reasonable, articulable suspicion of other illegal activity to prolong a traffic stop past the point necessary to complete the purpose of the stop—in this case, to write Richardson a speeding ticket.[74]

However, when an officer asserts a qualified immunity defense to a *Terry* claim, "the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support" the stop or the prolonging of the stop.[75] An officer who "reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity."[76] In the present case, qualified immunity is appropriate if Officer Steele had arguable reasonable suspicion to continue the traffic stop after giving Richardson and Govan a citation for speeding.

---

[73] *See Perkins*, 348 F.3d at 970 (holding that the circumstances did not permit officers to detain a driver and passenger after issuing a warning ticket).

[74] *Purcell*, 236 F.3d 1277.

[75] *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000).

[76] *Id.* at 1165-66.

Officer Steele argues that he had reasonable suspicion to prolong the traffic stop based on the following observations: (1) "Richardson, Jr. and Govan seemed more nervous than normal for a routine traffic stop," (2) "it took the van longer than normal to stop after [Officer Steele] turned his [patrol car] lights on," (3) "neither occupant of the van seemed to know where any of the relevant documents such as the van's registration or proof of insurance was located," (4) "Govan continued to communicate with someone on his cell phone while the stop was occurring," and (5) "[Richardson and Govan] gave different accounts of where they had just come from."[77]

Based on a review of the reasons that Officer Steele offered to support his decision to prolong the traffic stop, the Court finds that a jury must ultimately decide whether Officer Steele violated Richardson and Govan's Fourth Amendment rights.

First, there are genuine disputes as to whether Richardson took an excessively long time to pull over after Officer Steele activated his patrol car lights and whether Richardson and Govan gave conflicting statements about their previous delivery location. Officer Steele testified that Richardson continued driving for half-a mile-to a mile after Officer Steele turned his patrol car lights on, which he said put him on "high alert."[78] Richardson, on the other hand, testified that he saw Officer Steele driving behind

---

[77] Doc. 29-2, p. 9; Doc. 54, p. 4.

[78] Doc. 37, pp. 57:4-17, 62:9-13.

him without his patrol lights on and when Officer Steele then turned his lights on, "that is when I pulled over."[79] When taken in the light most favorable to Plaintiffs, a jury could find that Richardson pulled over immediately upon Officer Steele turning on his patrol car lights, negating one of the reasons that Officer Steele articulated as a basis for prolonging the stop.

Likewise, a genuine issue of fact exists as to when Officer Steele became aware that Richardson and Govan had conflicting stories regarding their previous delivery location. Govan testified that Steele asked both him and Richardson where they were traveling from when Officer Steele returned from running Richardson's license—prior to the drug-dog sniff and while both Richardson and Govan were still in their vehicle.[80] However, Officer Steele testified that he did not discuss Richardson and Govan's previous location with them,[81] and Deputy McDade testified that he merely "could have" asked them prior to conducting the drug-dog sniff.[82] Moreover, Officer Steele's warrant application affidavit states that McDade asked Richardson and Govan about their origin, but it is unclear whether it happened before or after the dog sniff occurred since the statement

---

[79] Doc. 44, p. 35:10-18.

[80] Doc. 46, p. 33:18-25.

[81] Doc. 37, p. 74:2-6.

[82] Doc. 38, p. 29:4-18.

appears in the warrant affidavit narrative after the portion pertaining to the results of the dog sniff.[83]

Viewed in the light most favorable to Plaintiffs, Officer Steele did not have Richardson and Govan's conflicting stories prior to deciding to prolong the stop, and this fact could not have contributed to the reasonable suspicion Officer Steele claims supported the dog sniff.[84]

Thus, the remaining facts from which Officer Steele could have had reasonable suspicion are Richardson and Govan's nervousness, their inability to locate the van's registration and/or proof of insurance,[85] and Govan's use of a cellphone during the stop.

Plaintiffs argue that there is a genuine issue of material fact regarding Richardson and Govan's nervousness. Officer Steele testified that both Richardson and Govan were nervous and shaking prior to Officer Steele writing the traffic citation.[86] In response, Plaintiffs filed declarations with the Court in which they aver that they showed no outward signs of nervousness.[87] However, Richardson testified that prior to Deputy

---

[83] Doc. 37-1, p. 1.

[84] *See, e.g., Jackson*, 206 F.3d at 1165 ("[A] police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of . . . the information possessed by the officer **at the time the conduct occurred**.") (emphasis added).

[85] *See supra*, note 10.

[86] Doc. 37, pp. 62:16 — 63:9, 64:2-10.

[87] Doc. 34-15, ¶ 4; Doc. 34-16, ¶ 4.

McDade arriving with the canine unit, Officer Steele asked him to step out of the vehicle and explained that Richardson seemed nervous, to which Richardson replied, "[W]ell, I am a bit nervous because I don't know the reason I am being pulled over. . . . So, yeah, I am pretty nervous."[88] Govan also testified that he told an officer he was nervous, but it is unclear who Govan told and whether this happened before or during the drug-dog sniff.[89] Thus, a jury will have to decide if the Plaintiffs were visibly shaking from nervousness (as Officer Steele testified) or if they were not (as the Plaintiffs testified).[90]

Plaintiffs also argue that regardless of whether they actually were nervous after being stopped, "[n]ervousness itself cannot be used to establish articulable suspicion."[91] However, although Richardson's nervousness is insufficient on its own to establish reasonable suspicion because "a traffic stop is an 'unsettling show of authority' that may 'create substantial anxiety,'"[92] it is still a "pertinent factor in determining reasonable

---

[88] Doc. 44, pp. 37:10—38:10.

[89] Doc. 46, p. 38:16-23.

[90] Also, if a jury found that Officer Steele did not visibly see any indication of Plaintiffs' nervousness, he could have been aware of it from Plaintiffs themselves. However, if the jury found that Plaintiffs never told Steele nor McDade until after the stop was prolonged, Officer Steele could not have relied upon their nervousness when he prolonged the stop.

[91] Doc. 34, p. 9.

[92] *Perkins*, 348 F.3d at 970 (quoting *Delaware v. Prouse*, 440 U.S. 648, 657 (1979)).

suspicion."[93] Therefore, the Court *must* consider Richardson's nervousness when assessing reasonable suspicion.

Plaintiffs also argue that the latter two facts (acting nervous during a traffic stop and giving conflicting stories as to where they have been) cannot give rise to reasonable suspicion of other illegal activity because neither is illegal. The Eleventh Circuit and the Supreme Court have consistently held that reasonable suspicion "may be formed by observing exclusively legal activity, even if such activity is seemingly innocuous to the ordinary citizen."[94] Finally, the issue of reasonable suspicion is one in which the Court must assess the "totality of the circumstances such that, while some individual factors may be consistent with innocent travel . . . they can also, when taken together, give rise to a reasonable suspicion."[95]

Despite all of these legal principles, the remaining factors in this case would not lead a reasonable officer to "believe his or her actions were lawful."[96] Defendants plainly assert that "Officer Steele observed two very nervous individuals driving a plain white

---

[93] *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

[94] *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) ("[T]here could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity is afoot . . . ."); *United States v. Sokolow*, 490 U.S. 1, 10 (1989) ("[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty' but the degree of suspicion that attached to particular types of noncriminal acts.").

[95] *United States v. Boyce*, 351 F.3d 1102, 1107 (11th Cir. 2003) (quoting *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990)) (internal quotation marks omitted).

[96] *Jackson*, 206 F.3d at 1165.

van that they did not own and did not seem familiar with[, and] [o]ne of the occupants of the van was continually communicating with someone on his cell phone while the traffic stop was occurring."[97] But, although Officer Steele explains in great detail his numerous proffered reasons for prolonging the traffic stop, he offers no details whatsoever as to exactly what specific crime or criminal activity would be implicated by these factors. As explained above, Officer Steele's traffic stop must have complied with not only the duration limitations outlined in *Terry*, but also its scope limitations. Although Richardson and Govan's failure to provide proof of ownership arguably gave Officer Steele justification to detain them for the purpose of determining if they lawfully possessed the vehicle, "detention for the purpose of the canine drug sniff was justified only if [Officer Steele] had reasonable suspicion that [they were] transporting drugs."[98]

Furthermore, Govan holding a cell phone during the stop—especially as a passenger who is unlikely to be concerned with a speeding violation or the resulting ticket—is so "susceptible to varying interpretations as to be innocuous."[99] Nervousness adds nothing to these factors that would create "a particularized and objective basis for

---

[97] Doc. 29-2, p. 9.

[98] *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001).

[99] *Id.* at 1269 (finding a motorist's possession of a cell phone to be innocuous in the context of a traffic stop). Furthermore, Govan is a young man, and it comes as absolutely no surprise to the Court that a man of Govan's age would be immersed in his cell phone to the point of having no idea that the van had actually been stopped.

suspecting" that Richardson and Govan were engaged in drug-related activity (or any crime at all other than speeding), and these facts lend themselves more to an "inchoate hunch" than to an objective justification for prolonging the stop.[100] Thus, Officer Steele lacked arguable reasonable suspicion to justify prolonging the traffic stop.

Despite this finding, the Court stresses that this analysis is based purely on the facts taken in the light most favorable to Plaintiffs, and a jury could choose to believe Defendants' version of the facts, which could possibly establish arguable reasonable suspicion.[101] Because of the genuine issues of fact, the Court must deny qualified immunity to Officer Steele on this claim.[102]

### 2. Whether the right Defendants allegedly violated was clearly established.

Although there is a genuine issue of material fact as to whether Officer Steele violated Richardson and Govan's constitutional rights by prolonging the stop, which precludes summary judgment in favor of Officer Steele, the Court considers the second prong in the qualified immunity analysis: whether the constitutional right Officer Steele is alleged to have violated was clearly established. To be clearly established, the

---

[100] *Lindsey*, 482 F.3d at 1290.

[101] *See Jackson*, 206 F.3d at 1166 (holding that a jury question existed as to arguable reasonable suspicion because "[w]hether arguable reasonable suspicion existed for Defendants' investigatory stop depends on whose version of events a jury believes.").

[102] *See Kelley v. Owens*, 317 F. App'x 865, 866 (11th Cir. 2008) ("Generally, when there are disputed issues of fact . . . qualified immunity must be denied because the court, at this stage of the proceedings, must view the facts most favorable to the plaintiff.") (quoting *Travers v. Jones*, 323 F.3d 1294, 1296 (11th Cir. 2003)).

constitutional violation must be "apparent" when viewed "in light of pre-existing law," such that the offending officer has "fair warning that his conduct deprived his victim of a constitutional right."[103] To satisfy this burden, Plaintiffs need not present case law that is materially similar, or even fundamentally similar, to the case at hand.[104]

As stated above, it was clearly established at the time of the alleged constitutional violation in this case that a traffic stop that lasts longer in duration than the time necessary to process the traffic violation without reasonable, articulable suspicion of other illegal activity violates the Fourth Amendment.[105] The facts of this case, taken in the light most favorable to Plaintiff and if credited by a jury, establish that Officer Steele violated this clearly established right. Therefore, Officer Steele is not entitled to qualified immunity, and his motion for summary judgment on Count I is denied.

### C.    Count II: Illegal Search of the Van

Next, Govan and Richardson, Jr., assert a Fourth Amendment claim against Officer Steele and the City for making alleged misrepresentations and omissions in their search warrant application. Specifically, Plaintiffs allege that Officer Steele's search warrant

---

[103] Hope, 536 U.S. at 739-40.

[104] *Id.* at 741.

[105] *Purcell*, 236 F.3d at 1277 (11th Cir. 2001) (citing *United States v. Holloway*, 113 F.3d 192, 196 (11th Cir. 1997)); *see also Illinois v. Caballes*, 543 U.S. 405, 407 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

application misstated that Richardson and Govan could only produce a shipping receipt, omitted that Richardson and Govan told officers about their origin and destination, omitted that the van was registered to Richardson's father, and that the search warrant was not based on probable cause.[106]

In response, Officer Steele again argues that qualified immunity shields him from any liability. As with Count I, Officer Steele is entitled to qualified immunity on this claim if he did not violate Richardson and Govan's clearly established constitutional rights.[107] When a defendant asserts qualified immunity in the context of the sufficiency of a search warrant application, a court will only refuse to recognize qualified immunity where "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable."[108]

Defendants argue that the only relevant factor in this inquiry is whether the drug dog alerted on the vehicle, since a drug-dog alert is sufficient in and of itself to establish probable cause for a search warrant.[109] Plaintiffs contend that the drug dog did not

---

[106] Doc. 20, ¶¶ 74—78.

[107] The Plaintiffs do not contest that at all times relevant to this case that the Defendants acted within their discretionary authority.

[108] *Lowe v. Aldridge*, 958 F.2d 1565, 1570 (11th Cir. 1992) (quoting *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986)).

[109] *See United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006).

actually alert on the vehicle's gas cap, which obviates probable cause to search. However, the record does not support Plaintiffs' contention.

Both Deputy McDade and Richardson testified that the dog did in fact alert on the gas cap.[110] Govan's declaration that he had "clear view of the dog" and did not see the dog "react in any way whatsoever when it reached the gas cap,"[111] does not create an issue of fact because he also testified that he was focused on Deputy McDade, and the dog was merely in his "peripheral."[112]

Plaintiffs also argue that a jury could find Deputy McDade's testimony regarding the alert to be incredible because "he is not actually a certified dog handler."[113] Even assuming this to be true, we are left with Richardson's testimony that the dog alerted on the vehicle's gas cap, which is uncontroverted. Thus, even with the facts taken in the light most favorable to Plaintiffs, there is sufficient evidence that the dog did alert on the vehicle's gas cap, and Officer Steele had probable cause to search the vehicle. In light of the positive drug-dog alert, Officer Steele's warrant application contained sufficient

---

[110] Docs. 38, p. 53:16-18; 44, pp. 39:24—40:9.

[111] Doc. 34-15, ¶ 10.

[112] Doc. 46, p. 43:13-18. *See Kelly v. Dun & Bradstreet, Inc.*, 641 F. App'x 922, 923 (11th Cir. 2016) (citing *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir.1984)) ("A party may not create an issue of material fact with an affidavit that contradicts his own previous, unambiguous testimony." Therefore, "[a] district court may properly grant summary judgment despite conflicts between a party's deposition testimony and later-filed affidavit.").

[113] Doc. 34, p. 16.

"indicia of probable cause" to be valid,[114] and Officer Steele is entitled to qualified immunity on this claim. The positive dog alert also obviated Defendants' need for a search warrant because it satisfies the automobile exception to the Fourth Amendment warrant requirement for a search.[115] Therefore, the search warrant and any inconsistencies within it are legally irrelevant.

The Plaintiffs also bring this claim against the City presumably because Plaintiffs allege that a reasonable officer in Chief Amerson's shoes "would have known that, if the facts were accurately reported by Officer Steele, that no reasonable judge would issue a search warrant," and "Chief Amerson and Officer Steele decided to transport Plaintiff to Jail . . . before any search warrant issued."[116] However, because actual probable cause existed to justify a warrantless search, the City committed no constitutional violation in

---

[114] *Lowe, supra*, n.107.

[115] *See United States v. Trejo*, 551 F. App'x 565, 568 (11th Cir. 2014) (citing *United States v. Virden*, 488 F.3d 1317, 1321-22 (11th Cir. 2007)) (the automobile exception "permits warrantless searched of a vehicle when there is probable cause to believe it contains contraband or evidence of a crime.").

[116] *Id.* at ¶¶ 79, 80.

searching the van.[117] Therefore, Officer Steele and the City are entitled to summary judgment on this claim.[118]

### D.    <u>Count III: False Arrest</u>

Govan and Richardson assert Count III against all three Defendants for false arrest because they allege that the Defendants failed to obtain a warrant for their arrest and lacked probable cause to arrest them. Officer Steele and Deputy McDade move for summary judgment on this claim based upon qualified immunity. In their motions, Officer Steele and Deputy McDade argue that Richardson and Govan were never under arrest, and even if they were, there was probable cause to arrest them based on the traffic violation and/or the drug-dog alert.

#### 1.    <u>Whether Richardson and Govan were arrested.</u>

As an initial matter, the Court effortlessly concludes that Officer Steele clearly and unequivocally arrested Richardson and Govan. No one could reasonably argue that a person who is placed in handcuffs, has their personal property confiscated from them, is placed in a patrol car and taken to a county jail where they are placed in a cell after being

---

[117] Plaintiffs also concede that the City cannot be liable for this claim because "based on the undisputed timing of Chief Amerson's arrival [at the scene of the traffic stop], he knew only that which had been reported to him by others. He did not know to what extent that information was false or exaggerated. . . . So while Chief Amerson participated in the decision to seek a warrant, his decision was reasonable based on what he believed to be true." Doc. 34, p. 27.

[118] The Court takes this opportunity to be explicitly clear that just because the Defendants are not liable for the search itself because it violated the Fourth Amendment, the Court will allow evidence of the facts relating to the delay caused by the search of the van because if the jury finds that Officer Steele violated Plaintiffs' rights by unconstitutionally prolonging the traffic stop, the Defendants could be liable for the results caused by that action.

strip-searched, photographed and booked and then held in that cell were merely detained. Although "[n]o brightline test separates an investigatory stop from an arrest,"[119] the Court must use "common sense and ordinary human experience" to distinguish between the two.[120] In this case, common sense alone would conclude that the Plaintiffs were, in fact, arrested.

However, turning to a traditional, legal analysis, the Court must weigh four factors to determine if a detention amounts to an arrest: (1) "the law enforcement purposes served by the detention," (2) "the diligence with which the police pursue the investigation," (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention."[121]

Considering the first *Acosta* factor, a suspect's "involuntary transport to a police station for questioning is sufficiently like [an] arrest" to require probable cause.[122] In this case, not only were Richardson and Govan handcuffed and transported to the Wilkinson County Sheriff's Department, they were also sent through the "sallyport" where other

---

[119] *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995)

[120] *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988).

[121] *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004) (quoting *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000)).

[122] *Kaupp v. Texas*, 538 U.S. 626, 630 (2003).

arrestees are taken, they were booked, they were strip-searched, and they were held without any form of communication for somewhere between two and four hours.

Defendants seek to justify this conduct by pointing to potential dangers associated with detaining Richardson and Govan at the scene of the traffic stop: "because the location of the initial stop was a busy highway, officer safety dictated that the vehicle be removed from the side of the road in order to make sure that no one was injured."[123] The Court certainly believes that are times when a search on the side of the road does not make sense. And, there are certainly times when law enforcement could potentially need to move a vehicle to a garage or other similar place in order to conduct a very thorough search. Under the facts of this case, the Court accepts the Defendants' arguments that they could not safely or adequately search the van on the side of the road.

In making this particular argument, Defendants focus only on the first of the four *Acosta* factors. However, "the law enforcement purposes served by the detention" could have also been served by taking Richardson and Govan to any other location—such as a parking lot or other spacious area—and keeping them in the patrol cars while the officers completed the search or even offering to take them to the location of their choice to wait

---

[123] Doc. 29-2, p. 12.

out the search.[124] Although the officers had this option, Chief Amerson testified that he never suggested that they follow that course.[125]

Additionally, the third factor in the *Acosta* analysis requires the Court to also consider "the scope and intrusiveness of the detention," which tips the scale decidedly against Defendants in this case.[126] The level of intrusiveness put this detention squarely in the realm of a formal arrest.[127] To put it bluntly, the Defendants have absolutely no reasonable argument or explanation as to why they handcuffed the Plaintiffs, forcibly transported them to jail in a patrol car, required them to wait for the completion of the search in a jail cell, alone, with none of their personal property, after being strip-searched, photographed, and booked in the process.

The fourth *Acosta* factor deals with the duration of the detention. In this case, there is very little evidence in the record as to how long the search actually took. The record contains some information that the Defendants had the dog conduct another free air sniff of the van and the dog alerted once more. The time taken to obtain the warrant from the magistrate does not necessarily appear to have been forcibly extended and the Plaintiffs

---

[124] *E.g., United States v. Jackson,* 548 F. Supp. 2d 1314, 1325 (M.D. Fla. 2008) (finding no unlawful seizure where "Defendant's vehicle was properly seized and Defendant and his passenger were transported by the police to a hotel of their choice.").

[125] Doc. 39, p. 23:4-6.

[126] *Acosta,* 363 F.3d at 1146.

[127] *See Owens v. Kelley,* 681 F.2d 1362, 1368 (11th Cir. 1982) ("[A]n officer may not ordinarily make any sort of an examination of a citizen's person unless he has sufficient probable cause to effect an arrest.").

do not argue that it was. The Court finds that the length of the detention neither hurts nor helps the Defendants in the Court's *Acosta* analysis.

Thus, the undisputed facts demonstrably prove that Richardson and Govan were not merely detained for investigative purposes within the meaning of *Terry*; they were undeniably arrested.

### 2. <u>Probable cause to arrest based on the initial traffic violation.</u>

Because Richardson and Govan were formally arrested, Officer Steele violated their Fourth Amendment rights unless he had probable cause to arrest them.[128] Because Officer Steele raises qualified immunity as a defense to this claim, the Court must grant him summary judgment unless Plaintiffs prove he lacked "arguable probable cause" to arrest Richardson and Govan.[129] Arguable probable cause exists in the context of an arrest when "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff."[130] Furthermore, arguable probable cause "depends on the elements of the alleged crime and the operative fact pattern."[131]

---

[128] *Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion).

[129] *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010).

[130] *Id.*

[131] *Id.*

As to Richardson, Defendants contend that Officer Steele had probable cause to arrest him based on the initial traffic violation. The Court agrees with this general statement of law but disagrees with Defendants' subsequent argument that the traffic violation justified Richardson's eventual arrest.

Speeding is a misdemeanor offense in Georgia,[132] and the Supreme Court and Eleventh Circuit have held that an arrest for a misdemeanor traffic violation does not run afoul of the Fourth Amendment.[133] However, neither *Atwater* nor *Draper* dealt with the legal implications of an officer writing a traffic citation for a traffic offense and then also deciding to arrest for the same offense well after the traffic stop had been concluded and without any articulation of any additional criminal offense.

In *United States v. Wilson*, the Eleventh Circuit recognized that Ga. Code Ann. § 17-4-23, which allows a police officer to "arrest a person accused of violating any law or ordinance governing the operation . . . of motor vehicles by the issuance of a citation provided the offense is committed in his presence," gives police officers in Georgia the "discretion to issue citations *rather than* make custodial arrests for traffic offenses."[134]

---

[132] *See* Ga. Code Ann. § 40-6-1.

[133] *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); *Draper v. Reynolds*, 369 F.3d 1270, 1276 n.8 (11th Cir. 2004) (citing *Atwater*, 532 U.S. at 355).

[134] *United States v. Wilson*, 853 F.2d 869, 873 (11th Cir. 1988) (emphasis added).

Officer Steele exercised his statutorily designated discretion and decided only to write a citation for Richardson's initial traffic violation. *Wilson* also makes it clear that he could not also choose to arrest Richardson after issuing a citation for the same violation. Moreover, the drug-dog sniff and alert were key intervening events between the issuance of the citation and the ultimate arrest. Critically, Officer Steele never informed either Plaintiff that they were being arrested for speeding; in fact, Officer Steele and Chief Amerson absolutely insisted in their depositions that neither Plaintiff was ever under arrest.[135] The undisputed facts in this case suggest that the true motive for the arrest was the drug-dog alert, which severed the causal connection between the traffic violation and the arrest. Furthermore, it was not until after the drug dog alerted that the officers on the scene decided to transport Richardson and Govan away from the scene and to the Wilkinson County jail. Defendants have not offered any reasonable basis for the Court to believe that the arrest was somehow connected to the initial traffic violation, and Officer Steele therefore cannot rely on the probable cause accompanying the initial traffic violation for arguable probable cause to arrest.[136]

---

[135] Doc. 37, pp. 86:14-17, 87:12-20, 95:10-16; Doc. 39, p. 41:13-23.

[136] The Defendants have also failed to offer any sort of explanation or reason as to why Govan could have been arrested for Richardson's speeding.

### 3.   Whether there was probable cause to arrest based on the drug-dog alert.

As an alternative, Plaintiffs fleetingly suggest that the drug-dog alert that gave them probable cause to search the vehicle also gave them arguable probable cause to *arrest* Richardson and Govan. Truthfully, the Court has not found a single United States Supreme Court, Eleventh Circuit, or Georgia Supreme Court decision definitively holding that a drug-dog alert alone can (or cannot, for that matter) establish probable cause to arrest.[137] However, Plaintiffs need not present a fact-specific or materially similar case to defeat qualified immunity.[138] In some instances, "broad statements of principle in case law are not tied to particularized facts" but can be so obviously clear that "every objectively reasonable [officer] facing the circumstances would know that the [officer's] conduct did violate federal law."[139] This is one of those instances.

Case law clearly establishes that an officer violates the Fourth Amendment when he conducts a warrantless arrest without probable cause.[140] Although this principle may be too broad to give officers fair notice of specific examples of unconstitutional conduct, relevant and controlling case law has clearly established that police may not "seek to

---

[137] For two excellent explanations of the difference between probable cause to search and probable cause to arrest, see *United States v. Francis*, 2007 WL 9718918, at *21-22 (N.D. Ga. Feb. 16, 2007) and *Caffee v. State*, 814 S.E.2d 386, 391-92 (Ga. 2018).

[138] *See Hope*, 536 U.S. at 741.

[139] *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012).

[140] *See Beck v. State of Ohio*, 379 U.S. 89, 91 (1964).

verify their [mere] suspicions by means that approach the conditions of arrest."[141] At the time Officer Steele effected the arrest in this case, he and the other officers on the scene had only a suspicion that the *van* may contain or had previously contained drugs—a suspicion that could have been confirmed by a search but that did not support a full custodial arrest. Defendants apparently concede to this concept in their brief,[142] and Chief Amerson testified to that effect in his deposition.[143] Additionally, Defendants fail to even specify the crime for which Officer Steele allegedly had probable cause to arrest. In this case, it can unequivocally be said that no reasonable officer in Officer Steele's shoes would have believed he had probable cause to arrest—which would necessarily include being handcuffed, involuntarily taken to jail in the back of a police car, being forced to enter the jail through the secure sallyport like others under arrest, being placed in a cell and strip-searched, having personal property taken, having a mugshot taken, and forced to await a search of a car in a jail cell—a suspect based solely and completely on a drug-dog alert.[144] Therefore, Officer Steele lacked even arguable probable cause to arrest

---

[141] *Royer*, 460 U.S. at 499.

[142] Doc. 29-2, p. 15 ("The detention was merely incident to a valid search. *Had contraband been found* and probable cause to believe a crime had been committed was established, *Plaintiffs may have been arrested at that time*. However, in this case no contraband was found . . . .") (emphasis added).

[143] Doc. 42, p. 41:13-23 ("Q: Did you believe at the time you saw the search warrant [which was supported by probable cause from the drug-dog alert] that there was probable cause to arrest the driver and passenger? A: The driver and passenger were never arrested. Q: So is the answer no? A: No.).

[144] *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010) ("Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff.").

Richardson and Govan, and his motion for summary judgment on their false arrest claim is denied.

### 4.  Deputy McDade

Plaintiffs also allege that Deputy McDade should be liable for their arrest because he "personally participated in, had knowledge of, and approved of, the decision to transport Mr. Govan and Mr. Richardson to the Wilkinson County Jail," even though "[t]here was no arguable probable cause to believe either Plaintiff committed any crime."[145] Deputy McDade asserts qualified immunity for this claim.

When plaintiffs sue an officer under Section 1983, they must show "an affirmative causal connection" between the officer's conduct and the constitutional violation.[146] It is not enough that an officer is present during an arrest; to be liable he must also be "part of the chain of command authorizing the arrest action."[147] In *Brown*, a city police officer arrested the plaintiff with the assistance of two other city police officers. Although one of the assisting officers told the arresting officer to arrest the plaintiff, the court held that the assisting officer could not be liable for false arrest because he was not the arresting

---

[145] Doc. 20, ¶¶ 84, 87.

[146] *Brown*, 608 F.3d at 737.

[147] *Id.*

officer's superior or in the arresting officer's chain of command.[148] The court also found it insignificant that the assisting officer arguably wanted the plaintiff to be arrested.[149]

The court's decision in *Brown* dictates the decision in this case.[150] Here, Officer Steele testified that all of the officers at the scene of the traffic stop decided to transport Richardson and Govan to the Wilkinson County jail.[151] However, Deputy McDade did not transport either Richardson or Govan to jail,[152] and although he testified that he knew they were taken to the Wilkinson County Sheriff's Department, he did not know they were held inside the jail.[153]

Like the assisting officer in *Brown*, Deputy McDade is not Officer Steele's supervisor, and as a Wilkinson County Sheriff's Deputy, he is outside the chain of command in the McIntyre Police Department that employed Officer Steele. Furthermore, Deputy McDade's agreement that Richardson and Govan should have been transported to jail only shows his own subjective desire that they be arrested, and "an officer's

---

[148] *Id.* at 736-37.

[149] *Id.*

[150] Plaintiffs' reliance on *Wilkerson v. Seymour*, 736 F.3d 974 (11th Cir. 2013), is misplaced. *Wilkerson* concerned a supervisory officer participating in a subordinate's arrest, which makes it inapposite to this case.

[151] Doc. 37, p. 86:2-9.

[152] Doc. 38, pp. 28:10-25, 35:2-9.

[153] The Wilkinson County Sheriff's Department and jail are located in the same building. Doc. 38, p. 35:7-9; Doc. 39, p. 22:15-25.

subjective intent is irrelevant in a qualified immunity analysis."[154] Therefore, Deputy McDade is entitled to qualified immunity on this claim and cannot be held liable for false arrest.

5.      **The City**

Finally, Richardson and Govan seek to hold the City of McIntyre liable for false arrest, alleging that "Chief Amerson, acting in his capacity as the Chief of Police for the City of McIntyre, participated in, had knowledge of, and approved of, the decision to transport Mr. Govan and Mr. Richardson to the Wilkinson County Jail."[155]

Generally, a municipality cannot be liable under Section 1983 for its employees' acts under a theory of respondeat superior unless those acts are committed in accordance with the municipality's policies or customs.[156] Thus, liability for a municipality under Section 1983 exists only when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."[157] Such liability can attach even for "a single decision by municipal policymakers under appropriate conditions."[158]

---

[154] *Brown*, 608 F.3d at 737.

[155] Doc. 20, ¶ 85.

[156] *Owen v. City of Independence, Mo.*, 445 U.S. 622, 633 (1980) (citing *Monell v. New York City Dep't of Social Svs.*, 436 U.S. 658 (1978)).

[157] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion).

[158] *Id.* at 480.

First, the Court must look to state and local law to determine whether Chief Amerson is final policymaking authority.[159] In this case, Defendants do not dispute that Chief Amerson is the final policymaking authority for the City of McIntyre Police Department, and Chief Amerson even testified to that effect.[160]

Because the City is not entitled to qualified immunity, summary judgment on this claim will be denied unless Chief Amerson had *actual* probable cause to arrest Richardson and Govan, rather than mere arguable probable cause.[161] The Court has already determined that there was not even arguable probable cause—let alone *actual* probable cause—to support Richardson and Govan's arrests; therefore, the City's motion for summary judgment on this claim is denied.

### E.  Illegal Seizure of Property

Next, Richardson, Sr., asserts a claim against all three Defendants for illegal seizure of property under the Fourth and Fourteenth Amendments based on his allegation that they illegally seized his delivery van, causing his business to miss deliveries, and ultimately causing him to lose his business. Defendants argue that the seizure was justified and that there is no evidence in the record to support this claim. In response, Plaintiffs can rely only on Richardson, Sr.'s deposition testimony, in which he

---

[159] *Davis v. City of Apopka*, ____ F. App'x _____, 2018 WL 1750557, at *2 (11th Cir. Apr. 12, 2018) (citing *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005)).

[160]  Doc. 39, pp. 14:21—15:23.

[161] *Davis*, at *4 (citing *Owen*, 445 U.S. at 638).

states that Lee Dales, a SEKO employee, told him that the implication of drug involvement arising from the traffic stop gave Richardson, Sr.'s business a "negative stigma."[162] Plaintiffs offered no testimony from Lee Dales, rendering Richardson, Sr.'s testimony nothing more than inadmissible hearsay that the Court cannot consider on summary judgment.[163] In the absence of admissible evidence to support his contentions, Richardson, Sr.'s claims fail, and Defendants are entitled to summary judgment on this claim.

### F. Count V: State-Law Claims Against Officer Steele

Govan and Richardson also assert state-law claims against Officer Steele for false imprisonment under Ga. Code Ann. § 51-7-20, assault under Ga. Code Ann. § 51-1-13, and battery under Ga. Code Ann. § 51-1-14. In defense, Officer Steele claims that he is entitled to official immunity under Georgia law.

Public officials enjoy official immunity under Georgia law when they are sued "in their individual capacities for discretionary actions within the scope of their official authority performed without actual malice or actual intent to cause injury."[164]

---

[162] Doc. 45, pp. 40:9—41:15.

[163] *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.") (footnotes and citations omitted); *see also* Fed. R. Civ. P. 56(e).

[164] *Rodriguez v. Kraus*, 619 S.E.2d 800, 802 (Ga. Ct. App. 2005).

Discretionary actions include decisions to arrest suspects.[165] Actual malice is shown by more than ill will; it "must also be combined with the intent to do something wrongful or illegal."[166] Moreover, to prove actual intent to cause injury, a plaintiff must show that the defendant intended to harm the plaintiff, rather than simply showing that the defendant intended to do the act that resulted in the harm.[167]

Here, Plaintiffs offer no evidence that Officer Steele acted with actual malice or actual intent to cause injury. Officer Steele's errors were negligent at worst, which is insufficient to overcome official immunity. Therefore, the Court grants Officer Steele's motion for summary judgment on Plaintiffs' state-law claims.

### G.   Count VI: State-Law Claims Against the City

In his Complaint, Govan also brings state-law claims against the City for false imprisonment under Ga. Code Ann. § 51-7-20, assault under Ga. Code Ann. § 51-1-13, and battery under Ga. Code Ann. § 51-1-14. In his response to the City's motion for summary judgment, Govan abandoned his assault and battery claims and proceeds only on a claim of false imprisonment.[168] The City claims that it is entitled to sovereign immunity under Georgia law.

---

[165] *Id.*

[166] *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999).

[167] *Hart v. Sirmans*, 784 S.E.2d 67, 69 (Ga. Ct. App. 2016).

[168] Doc. 34, p. 30.

In Georgia, sovereign immunity shields a municipality from suit unless the Georgia General Assembly waives the immunity.[169] Furthermore, Ga. Code Ann. § 36-33-3 provides that a city "shall not be liable for the torts of policemen or other officers engaged in the discharge of the duties imposed on them by law." However, the Georgia General Assembly expressly waives this immunity if the city purchases liability insurance that covers torts committed by the city's police officers.[170] Where such liability insurance exists, the city is only liable up to the limits of that policy.[171]

Plaintiffs allege in their Complaint that "[t]he City of McIntyre purchased liability insurance that provided coverage and indemnification for liability arising from the operations of the City's police department and the conduct of law enforcement officers employed by the City."[172] As proof of this, Plaintiffs also submitted a copy of the City's insurance policy.[173] The policy itself states that the Georgia Interlocal Risk Management Agency ("GIRMA") agrees to pay all money damages arising from "Law Enforcement

---

[169] *Primas v. City of Milledgeville*, 769 S.E.2d 326, 328 (Ga. 2015).

[170] Ga. Code Ann. § 36-33-1(a); *see also Reese v. City of Atlanta*, 583 S.E.2d 584, 585 (Ga. Ct. App. 2003); *Stefani v. City of Grovetown*, 2016 WL 4611575, at *10-11 (S.D. Ga. Sept. 2, 2016) ("The interaction between the governmental immunity granted by O.C.G.A. § 36-33-3 and the waiver of immunity in O.C.G.A. § 36-33-1(a) has been subject to surprisingly little litigation. . . . The Court concludes that the immunities granted by §§ 36-33-1 and 36-33-3 are subject to the liability-insurance-waiver provision in § 36-33-1(a).").

[171] Ga. Code Ann. § 36-33-1(a).

[172] Doc. 20, ¶ 103.

[173] Doc. 34-18.

Liability," which includes "liability for constitutional or civil rights claims . . . or other such claims arising from law enforcement activities."[174] The policy also states that GIRMA is obligated to pay all money damages arising from any "Personal Injury," which explicitly includes injuries resulting from "false arrest, detention, imprisonment or malicious prosecution."[175] Thus, any damages arising from Govan's false imprisonment claim against the City would be paid by GIRMA under the insurance policy, which constitutes a waiver of sovereign immunity for this claim. Therefore, the City's motion for summary judgment on this count is denied.

<u>CONCLUSION</u>

For the reasons stated herein, Deputy McDade's Motion for Summary Judgment [Doc. 27] is **GRANTED**, and all claims against him are dismissed. Officer Steele and the City's Motion for Summary Judgment [Doc. 29] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Count I (Illegal Detention): **DENIED**
2. Count II (Illegal Search): **GRANTED**
3. Count III (False Arrest): **DENIED**
4. Count IV (Illegal Seizure): **GRANTED**
5. Count V (State-Law Claims Against Officer Steele): **GRANTED**
6. Count IV (State-Law Claims Against the City): **DENIED.**

---

[174] Doc. 34-18, pp. 30, 32.

[175] *Id.*

Accordingly, Richardson and Govan's illegal detention claims against Officer Steele and their false arrest claims against Steele and the City, as well as Govan's state-law unlawful detention claim against the City will proceed to trial.

**SO ORDERED**, this 8th day of August, 2018.

<u>**S/ Tilman E. Self, III**</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**